**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ACCENTURE LLP,<br><br>                    Petitioner,<br><br>v.<br><br>STEPHANIE NEAL TRAUTMAN,<br><br>                    Respondent. | CASE NO.<br><br>**ECF Case** |

## PETITION FOR A PRELIMINARY INJUNCTION IN AID OF ARBITRATION

Plaintiff Accenture LLP ("Accenture"), by and through its undersigned counsel, petitions for a preliminary injunction in aid of arbitration pursuant to Federal Rule of Civil Procedure 65 and 9 U.S.C. § 2 against Defendant Stephanie Neal Trautman ("Trautman"), and alleges as follows:

## NATURE OF THE ACTION

1.      Accenture brings this action seeking an injunction in aid of an arbitration between Accenture LLP and its former employee Stephanie Trautman. Accenture has initiated arbitration to enforce its non-compete agreement with Trautman, who until she terminated her employment last month was a senior sales executive at Accenture. In her employment agreement,[1] Trautman agreed, for a period of twelve months after leaving Accenture, not to assume responsibilities with a direct competitor that were the "same as or similar to" Trautman's role over the prior eighteen months at Accenture. Notwithstanding this reasonable restriction on her post-Accenture employment, Trautman left Accenture as of February 10, 2021 and has since joined Wipro Limited

---

[1] A copy of Trautman's employment agreement is attached hereto as Exhibit 1.

("Wipro") as Chief Growth Officer, a senior executive sales role at a direct Accenture competitor, where she will perform the same or similar services she performed at Accenture.

2.     As a senior sales leader at Accenture, Trautman had access to and intimate knowledge of Accenture's sales strategies, prices, margins, and pipeline.  She now intends to work for a direct and significant competitor as the head of sales, in a position directly recruited by and reporting to the competitor's CEO, Thierry Delaporte, and Board Chairman, Rishad Premji, where she will be part of creating the competitor's global strategy.  In that senior global role, she will be able to take the knowledge and skills she obtained at Accenture, including over the last 18 months, and apply the Accenture playbook across the entire Wipro client base.  That is precisely what Accenture's non-compete agreement was designed to prevent—and appropriately so—to protect Accenture's competitive position, its confidential information, and its client goodwill.

3.     Trautman was a very highly compensated professional at Accenture, with total compensation exceeding $1 million in her last year with the company.  Over her last eighteen months at Accenture, Trautman held the lead sales role for Accenture's financial services group; served as the "Diamond Client Account Lead" for one of Accenture's largest clients and was part of the Diamond Leadership Council, where she received information about, and provided input into, strategies for Accenture's largest clients that make up approximately half of Accenture's revenue; served on the Northeast Leadership Team at Accenture, where she received regular financial and strategy updates on every major contract Accenture won, lost, or was competing for across all clients headquartered in the northeastern United States regardless of where they operate around the world and across all industries that Accenture serves; and served on Accenture's Global Leadership Council, where she also received regular updates on Accenture's global strategy and business plan for the next several years.

4.     In short, Trautman was a senior executive with significant sales and client management responsibilities within Accenture, who served on multiple leadership committees that gave her financial and strategic information and insights into Accenture's key clients, key competitive strategies, and financial performance.  It is exactly the broad experience and global exposure that Trautman gained from these roles that Wipro believes qualifies her to take on the role of Chief Growth Officer and report directly to its CEO.

5.     Notwithstanding her roles as a sales leader with access to extensive competitive information, Trautman recently resigned from Accenture and announced that she would be joining Wipro, where she will be directing that company's efforts to compete directly against Accenture. According to LinkedIn and Wipro's press statements, Trautman has been named Chief Growth Officer at Wipro, a direct competitor of Accenture in almost every offering and industry in which Accenture operates.  The Chief Growth Officer position at Wipro is a global leadership role, and the decisions Trautman makes in that role—decisions that will involve her knowledge of competitive information, including Accenture's plans, pricing, and strategy—will impact the entire Wipro organization on a global scale.

6.     Accenture immediately engaged with Trautman and her counsel when she announced her departure from Accenture, to determine whether there were reasonable restrictions she could be subject to in order to protect Accenture's interests under the non-compete covenant she agreed to.  Trautman, through her counsel, assured Accenture on February 10, 2021, that "as we discuss resolving this matter . . . Trautman will not commence employment with WIPRO.  If these plans change, I will give you sufficient advance notice."  Those assurances turned out to be false and misleading.  Accenture learned for the first time on March 2, 2021, that Trautman had, in fact, started to work at Wipro.  Neither Trautman, her counsel, nor Wipro ever provided any

"advance notice," let alone any notice at all, despite the promise to do so.  Instead, Trautman deceived Accenture by starting in her role at Wipro and continuing to represent through her counsel that she had not.

7.     Subsequent to Accenture belatedly learning that Trautman had already begun her work at Wipro, Accenture employees began receiving emails from an executive recruiter working on behalf of Wipro and Trautman.  These emails targeted Accenture sales executives, who were told that a "leadership career opportunity" awaited them at Wipro.  The solicitation said that the recruiter had been "working extensively with Thierry Delaporte [Wipro's CEO] [and] Stephanie Trautman . . . to identify a new league of leaders for driving their next growth phase."  Another e-mail from this recruiter told an Accenture employee that she should join Wipro because it is "currently witnessing a global transformation under their new CEO and Chief Growth Officer," *i.e.,* Stephanie Trautman.  Thus, in the midst of its dispute over Trautman's non-compete with Accenture and despite Trautman's contractual obligation to refrain from soliciting, or assisting any other party from soliciting, certain Accenture employees, Wipro sought to recruit Accenture employees to join Trautman in her effort to compete against Accenture, specifically invoking the "growth" role for which Wipro hired Trautman.

8.     To prevent Trautman from competing against Accenture in the same or similar line of work for a direct competitor before the dispute can be arbitrated, she must be held to the reasonable non-competition obligations to which she willingly and voluntarily agreed in exchange for her employment at Accenture.  Accenture respectfully requests that this Court, in aid of arbitration, grant injunctive relief "restraining [Trautman] from committing or continuing to commit a[] violation of the [non-competition covenant]" in her Employment Agreement.  Ex. 1, Employment Agreement at Ex. B, Restrictive Covenant Agreement ("RCA"), § 2(b).

## THE PARTIES

9.      Plaintiff Accenture LLP is a limited liability partnership.  Accenture LLP has three partners: Accenture Inc., Accenture Sub II Inc., and Accenture LLC.  Accenture Inc. and Accenture Sub II Inc. are incorporated under the laws of Delaware and have their principal places of business in Delaware.  Accenture LLC has one member, Accenture Sub LLC.  Accenture Sub LLC also has one member, Accenture Inc., which as noted above is incorporated in Delaware.

10.     Defendant Trautman is a citizen and resident of the State of Ohio.  She is a former senior sales executive at Accenture, and has accepted employment as Chief Growth Officer at Wipro, a direct competitor of Accenture.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this is an action between citizens of different States.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     The Court has personal jurisdiction over Trautman by virtue of her consent, in Section 13(f)(i) of the Employment Agreement, to the exclusive jurisdiction of courts located in New York for any lawsuit seeking preliminary relief in aid of an arbitration, including without limitation, preliminary relief to restrain Trautman from breaching the restrictive covenants in the Employment Agreement.  This Petition seeks injunctive relief solely in aid of arbitration.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) and Section 13(f)(i) of the Employment Agreement, which designated the courts of New York as the exclusive venues for any lawsuit seeking preliminary relief in aid of an arbitration, including without limitation, preliminary relief to restrain Trautman from breaching the restrictive covenants in the Employment Agreement.

# FACTUAL ALLEGATIONS

## I.      Accenture's Business

14.     Accenture is a leading global professional services company.  It provides a broad range of services in strategy and consulting, interactive, technology and operations, and has digital capabilities across all of these services.  It serves clients in more than 120 countries to help build their digital core, transform their operations, and accelerate revenue growth—creating tangible value across their enterprises at speed and scale.

15.     Trautman was a senior sales executive at Accenture.  Her role as a sales leader had global reach.  Between 2016 and 2020, her efforts were focused on selling Accenture's full suite of services to financial services clients, which include high- and mid-tier companies with global operations in the insurance, banking, and capital markets industries.  The services and offerings she brought to those clients are not industry-specific; rather, they reflect services that Accenture provides across its client base, including cloud migration, infrastructure transformation, and business process outsourcing.  Trautman combined Accenture's capabilities across management consulting, strategy, technology, and business process outsourcing—together with Accenture's industry and functional expertise and specialized software and assets—to provide highly differentiated, end-to-end services for clients.

16.     The strategies and solutions developed and offered by Accenture, and the technologies that Accenture employs to implement those strategies and solutions, are among Accenture's most critical confidential and proprietary information.  Competitors with knowledge of Accenture's strategies and solutions, including its offerings, pricing targets, sales pipeline, and targeted opportunities, can effectively reproduce them for their own clients, improve their own services to be more competitive with Accenture, or use that knowledge to poach Accenture's existing client base—all without investing the substantial time and resources that Accenture did to

develop its strategies and solutions in the first instance.  Accenture's strategic insights and knowledge of industry- and client-specific information play a key role in helping Accenture sustain its competitive advantage over other competitors, such as Wipro, that operate in the same space.

## II.    Trautman's Role At Accenture

17.    Trautman was an Accenture employee for eight years.  Trautman joined Accenture as a Managing Director and Sales Lead in Insurance, a subset of the financial services group, in November 2013.  Trautman was promoted to Financial Services Sales Leader for North America in August 2016, and then to Global Strategic Account Lead in June 2019, a position she held until she left Accenture on February 10, 2021.

18.    As Financial Services Sales Leader for North America, Trautman was responsible for managing North American sales in banking, capital markets, and insurance, which included the global operations for over 400 clients based in North America.  She also managed the overall sales plan and strategy across all Accenture services and offerings in financial services.  In that role, Trautman was tasked with overseeing sales leadership, managing and growing the sales team, and approving larger sales in a group that generated billions of dollars in revenue for Accenture under her leadership.  Trautman's role also required her to understand Accenture's full range of capabilities and products and how to best sell all of Accenture's products to the broad client base she was responsible for.

19.    Trautman was named Global Strategic Account Lead in June 2019.  Trautman held the Global Strategic Account Lead position and her previous sales leadership position simultaneously for nine months, until March 2020.  Trautman was in her sales leader role for over six of her last eighteen months at Accenture and therefore performed that role for more than a third of the period covered by her non-compete.  In March 2020, Trautman transitioned out of her sales leader position and fully stepped into the Global Strategic Account Lead role.

20.     As a Global Strategic Account Lead, Trautman was primarily responsible for a "diamond" client in the financial services area.  This position was also referred to as a "Diamond Client Account Lead" ("DCAL").  In her role as a DCAL, Trautman was responsible for building business relationships with senior executives at the client to better understand its priorities and needs and the opportunities available for Accenture's services.  Trautman was expected to have extensive knowledge of and to sell (and she did sell) all of Accenture's offerings and product lines, so she could develop solutions using Accenture's products to meet the client's strategic and business needs globally.  Beyond that, Trautman's role required an understanding of Accenture's broader business strategy so that Trautman could incorporate those strategies into her work with clients.

21.     The DCAL role is held by a small subset of highly compensated Accenture sales executives.  The role is critical at Accenture, and DCALs across industry groups and geographic areas meet on a regular basis to coordinate and share confidential insights, learnings and methodologies relating to Accenture's work to drive value for its clients, and thus further enable Accenture to continue to drive sales and growth.  DCALs at Accenture are the key executives responsible for approximately 200 of Accenture's largest clients, and they (including Trautman) have significant exposure to all of Accenture's key sales strategies, tactics, metrics, and plans.

22.     The Sales Leader and DCAL roles require similar skills to be effective.  For example, a DCAL serves as a relationship manager for a client account and is tasked with selling all of Accenture's offerings to his or her client.  A Sales Leader works with client account leads to originate new and creative sales ideas and coaches them through how to pitch those ideas to their clients, in line with Accenture's overall sales strategy.  Sales Leaders and DCALs both attend "new business meetings," in which they pitch new deal ideas to Accenture senior leadership and, in turn,

receive advice about how to secure those deals, including about pricing parameters, target margins, and overall strategy.  Moreover, the underlying offerings Trautman took to market in both these roles were generally consistent across industries; her knowledge of those offerings and their respective go-to-market strategies thus has broad applicability to industries other than those she served.  Trautman developed her expertise and a holistic knowledge of how Accenture drives sales by serving in both of these roles.

23.    Reflecting the breadth and significance of her role, Trautman was also a member of three leadership groups at Accenture within her last eighteen months at Accenture: the Northeast Leadership Team, the Global Leadership Council, and the Diamond Leadership Council.  These leadership groups were limited to a small number of key executives who had access to, and collaborated about, Accenture's key strategic initiatives, including target markets, existing competition for new business, and pricing.

24.    The Northeast region consists of all clients and their global operations, regardless of industry, headquartered in the northeastern United States.  Created as part of a reorganization that shifted internal focus from industries to regions that encompass all industries Accenture serves, Trautman's role on the Northeast Leadership Team exposed her to sales efforts and strategies across Accenture's entire base of clients headquartered in the northeast, many of whom have global operations.  The team held monthly meetings, during which Trautman and other DCALs and leaders across all of Accenture's industry groups engaged in comprehensive strategic discussions and shared key updates, including ongoing campaigns and deals each team was working towards, recent successes, and suggested feedback.  The team also discussed Accenture's proprietary sales campaigns that were designed to address a variety of client needs and were used across clients based in the region.

25.     During these leadership meetings, Trautman had access to, and learned, confidential information about Accenture's strategy for clients and groups beyond financial services.  Trautman was privy to broad strategic conversations and decisions being made at the highest levels of Accenture, deal-specific competition, regional profit and loss results, and global sales strategy.  In presentations that accompanied these discussions, Trautman learned about the sales campaigns Accenture planned to employ, the action items used to support those campaigns, and the clients and client targets to which the campaigns would be directed, again, worldwide.

26.     The leadership meetings not only included discussions of current sales and pricing strategy; they also involved discussions of Accenture's long-term growth strategy for global clients headquartered in the northeastern United States.  An overview of the three-year growth strategy presented at one such meeting in the second half of 2020 provided details on Accenture's priority industries and clients, "growth" and "high priority plays" to achieve targeted revenue growth, and step-by-step campaigns intended to increase Accenture's market share for each and every client group Accenture serves and services it offers.  As a part of leadership, Trautman had ready access to this type of long-term strategy plan, specifically including new services Accenture had plans to introduce and grow in 2021.

27.     Trautman was a member of the Global Leadership Council ("GLC"), with a group of approximately 200 of the most senior global leaders across Accenture.  Accenture describes its GLC members as "exemplars of Accenture's strategy," who "execute Accenture's strategy and use innovation to set the next horizon."  The GLC regularly met to discuss Accenture's strategy as a whole, across all regions and industries.  In those quarterly meetings, Accenture's CEO and senior executives shared highly confidential sales projections based on Accenture's company-wide sales pipeline, updates on Accenture's competitive standing among its peers, specifically including

Wipro, and concrete action plans for new offerings.  GLC members also shared recent successes and challenges related to specific major clients in various industries and their plans to counteract those challenges in the upcoming quarters.

28.     In addition, Trautman was a member of the Diamond Leadership Council ("DLC"), which included all Diamond Client Account Leads globally, and also served on the steering board of the DLC, which included a select group of DCAL leaders.  DLC members were exposed to Accenture's forward-looking strategy for its diamond clients in 2021 and beyond, and collaborated on how to learn from recent successes and apply that knowledge to meet the needs of other diamond clients across various industries.  And as described above, during the periodic meetings of these senior sales leaders, members coordinated to create and discuss highly confidential Accenture plans, upcoming client opportunities, and the pipeline for Accenture's most significant clients and deals.

## III.    Trautman's Contractual Obligations To Accenture

29.     As a senior sales executive with exposure to highly confidential and commercially sensitive information, Trautman was asked to sign a Restrictive Covenant Agreement ("RCA") as part of her Employment Agreement with Accenture.  Trautman signed the RCA on September 23, 2013, and it was effective as of her first day at Accenture, November 4, 2013.  *See* Ex. 1, Employment Agreement.

30.     Trautman acknowledged and agreed to the Non-Competition Covenant, which states that:

> [Trautman] shall not, during the period of [her] employment with Accenture and for a period of twelve (12) months following the termination of [her] employment with Accenture (the "Restricted Period") associate . . . with any Competitive Enterprise in the Territory in any capacity which involves the performance of services that are the same as or similar to those you performed for

> Accenture or its Affiliates within the eighteen (18) months prior to
> the date on which your employment with Accenture terminated[.]

Ex. 1, Employment Agreement at Ex. B, RCA, § 1(b).

31.    The RCA provides the following definitions for the defined terms in the Non-

Competition Covenant:

> (a)    "Competitive Enterprise" means "a business enterprise that engages in, or
> owns or controls a significant interest in any entity that engages in, the
> performance of services of the type conducted, authorized, offered or
> provided by Accenture or any of its affiliates." *Id.* at Ex. B, RCA, § 1(a)(3).

> (b)    "Territory" means "the territory or territories within which [Trautman]
> actually worked, or in respect of which you were involved in providing
> services to, during the twelve (12) months immediately preceding the time
> of termination." *Id.* at Ex. B, RCA, § 1(a)(8).

32.    Trautman thus agreed in the RCA that, for the twelve months following the

termination of her employment from Accenture, she would not work for any competitor of

Accenture (1) where she would perform responsibilities that are the same as or similar to those she

performed in the last eighteen months of her employment at Accenture or (2) in any geographic

area for which she had job responsibilities in the last twelve months of her Accenture employment.

33.    Trautman also agreed and acknowledged in the RCA that:

> (a)    During the course of her employment with Accenture, she was and would
> have been provided with access to confidential information and trade
> secrets;

> (b)    The "terms and conditions set forth in this [RCA]," including the
> geographic and temporal limitations in the Non-Competition Covenant,
> "***are reasonable, fair, and necessary*** to protect Accenture's and its
> Affiliates' legitimate business interests";

> (c)    "Accenture and its Affiliates would ***suffer significant and irreparable
> harm*** from [Trautman] competing with Accenture for a period of time
> following [her] termination of employment";

> (d)    Trautman's "unauthorized or improper use or disclosure" of Accenture's
> confidential information or trade secrets would "***cause serious and
> irreparable harm*** to Accenture and its Affiliates"; and

(e)     The terms and conditions in the RCA "***will not unreasonably affect [Trautman's] professional opportunities*** following termination of [her] association with Accenture."

*Id.* at Ex. B, RCA, Preamble (emphases added).

34.     The Employment Agreement includes a dispute resolution provision, which requires that "any and all disputes . . . arising out of, relating to or in connection with . . . any or all noncompetition or non-solicitation agreements and obligations, confidentiality, intellectual property[,] or[] nondisclosure agreements or obligations" must be settled through arbitration "in accordance with the then-existing Rules of Arbitration of the International Chamber of Commerce." Ex. 1, Employment Agreement, § 13(b).  Parties are permitted, however, to "bring an action or proceeding in any court of law for the purpose of . . . seeking temporary or preliminary relief in aid of an arbitration." *Id.* § 13(d).

35.     Trautman acknowledged and agreed to a similar provision in the RCA, which states that Accenture shall "be entitled to an injunction, restraining order, or other equitable relief . . . restraining you from committing or continuing to commit any violation of the covenants." *Id.* at Ex. B, RCA, § 2(b).

**IV.     Accenture And Wipro Are Direct Competitors**

36.     Wipro is a leading global information technology, consulting, and business process services company.  As a leader in "digital transformation strategy and consulting," Wipro helps drive its clients to success in a digital world by "leverag[ing] the potential from digital technologies like AI, automation, and Cloud." *See Consulting*, Wipro Limited, https://www.wipro.com/consulting/ (last visited Mar. 5, 2021).

37.     Wipro offers services in fields that overlap almost entirely with those Accenture operates in, including in information technology, consulting, and business operations.

38.     Wipro purports to be a global firm with a "business-anywhere" mindset and operates in 44 countries around the world.  *See* Wipro Limited, https://www.wipro.com/ (last visited Mar. 5, 2021).  Accenture is also committed to driving change worldwide, and it operates in 50 countries across six continents.

39.     There is significant overlap in the industries that Wipro and Accenture serve. Notably, both companies serve clients in the banking, capital markets, and insurance industries, in which Trautman played a key role at Accenture.

40.     Wipro and Accenture are often in direct competition with each other—they offer competing services and solutions to the same group of clients and potential clients, and operate in the same global market.  Wipro also appears as a competitor on specific business efforts identified in the highly confidential competitive briefings that Trautman received in her role as a member of the Northeast Leadership Team through the time she left Accenture.

## V.     Trautman Plots To Leave Accenture And Join Wipro As Chief Growth Officer, Violating Her Contractual Obligations Under The RCA

41.     In the fall of 2020, Trautman began discussing a potential role at Wipro.  Forensic review of Trautman's computer shows that she was recruited by Wipro's Chief Executive Officer, Thierry Delaporte, and Wipro's Chairman, Rishad Premji, among other senior Wipro executives. Trautman continued to work at Accenture for months while in active discussions with Wipro. During this time period Trautman told no one at Accenture of her plans to leave, but continued to attend leadership meetings where highly confidential information was discussed and to receive and review highly confidential information.

42.     Trautman terminated her employment at Accenture, effective on February 10, 2021, and soon thereafter joined Wipro as Chief Growth Officer.  Trautman's responsibilities

in her new role as Wipro Chief Growth Officer are the same as or similar to those she performed during her last eighteen months at Accenture.

43.     As Wipro's Chief Executive Officer explained, Trautman "will drive new market momentum and large deal focus, strengthen [Wipro's] sales capability and sharpen Wipro's market positioning." *See* Shilpa Phadnis, *Wipro hires senior regional leaders*, Times of India (Feb. 23, 2021, 8:57 AM IST), https://timesofindia.indiatimes.com/business/india-business/wipro-hires-senior-regional-leaders/articleshow/81164570.cms.   He lauded Trautman for the "tremendous amount of experience and strategic insight" she brings to the Wipro executive board.  *Id.*

44.     Trautman derived the "experience and strategic insight" for which she was hired from the eight years she spent in senior sales roles at Accenture, including during her last eighteen months.  Trautman's job was to facilitate and lead sales, and she was directly involved in strategy setting.  In these roles and in performing her duties as a member of the Northeast Leadership Team, Global Leadership Council, and Diamond Leadership Council, she received information on a routine and ongoing basis about all major sales strategies, pricing strategies, and growth strategies for clients with global operations, all within her last eighteen months at Accenture.

45.     It takes years of experience at Accenture to gather the knowledge and understanding of Accenture's offerings and marketing strategy necessary to be an effective and successful DCAL.  As a DCAL, Trautman was responsible for understanding and marketing all of Accenture's strategies so that she could build Accenture's client relationship.  In that role, she gained access not only to information about sales strategies for a particular, but also to sales strategies across all of Accenture's most significant clients, so that she could apply the most effective strategies in her efforts.  Additionally, in monthly meetings with the Northeast Leadership

Team, Trautman gained access to information about large deals Accenture engaged in across all industries and including competition directly with Wipro.

46.     Upon information and belief, at Wipro, Trautman will also play a key role in driving large deals, similar to those she was involved in at Accenture, and strengthening relationships with Wipro's current growth partners and clients.  Because Trautman's work for Wipro is the same as or similar to the services she provided during her last eighteen months at Accenture, and because the work operates in the same territory in which she performed her work for Accenture, Trautman's employment at Wipro breaches the Non-Competition Covenant.  Indeed, in a February 10, 2021 email to Accenture, Trautman's counsel conceded that the Chief Growth Officer position that Wipro offered to her could "involve the performance of services similar to what she performed in a limited capacity for Accenture in the 2d half of 2019," which is within the 18-month lookback period prescribed by her non-compete.  Thus, Trautman's counsel admitted that the proposed role at Wipro, if she took it, would violate the terms of the Non-Competition Covenant.

47.     Just as it was vital to her role at Accenture, Trautman's extensive knowledge of Accenture's highly confidential strategies and solutions across services and industries will be highly relevant and valuable to the strategy, planning, and decision-making responsibilities she holds in her new role at Wipro.  Indeed, shortly before leaving Accenture, Trautman attended meetings at which "Top Competitive Deals" for the second quarter of fiscal year 2021 were discussed.  Trautman was (and still is) intimately familiar with Accenture's sales strategy and playbook, and at Wipro she will be able to use that as an advantage any time she competes against Accenture.

48.     Trautman's role at Wipro is a global leadership role.  Her reach as Chief Growth Officer, and the decisions she makes in that role, will impact all of Wipro and its business.  As

such, the broad knowledge Trautman has of Accenture's highly confidential and proprietary sales strategies, pricing targets, and overall playbook is particularly dangerous in her new role, as she will not just be applying the Accenture playbook to one client or industry at Wipro (which would itself be a violation of the non-compete), but across the entire organization.

## VI.    Accenture Will Be Irreparably Harmed By Trautman's Conduct

49.    Absent an injunction, Accenture will suffer immediate and irreparable harm to its business and goodwill for which there is no adequate remedy at law.

50.    Granting the requested preliminary injunction will ensure that any arbitration award that Accenture may subsequently obtain against Trautman will not be rendered ineffectual absent injunctive relief.  Without an injunction, Accenture will suffer harm that no arbitration can remedy. As a result, the parties' arbitration would be effectively rendered moot.

51.    Trautman's violation of the Employment Agreement's Non-Competition Covenant would result in substantial and irreparable harm to Accenture.  Given the overlap between Trautman's previous positions at Accenture and her work for Wipro, Trautman will be competing directly against Accenture, in violation of a reasonable and enforceable non-compete agreement that explicitly—and only temporarily—prohibits Trautman from performing the same or similar role at a competitor of Accenture for a twelve month period following her departure from Accenture that she performed at Accenture for eighteen months prior to her departure.

52.    Indeed, in her Employment Agreement, Trautman "acknowledge[d] and agree[d] that Accenture's remedy at law for any breach of the covenants contained [in the Employment Agreement] would be inadequate and that for any breach of such covenants, Accenture shall . . . be entitled to an injunction . . . restraining [her] from committing or continuing to commit any violation of the covenants."  Ex. 1, Employment Agreement at Ex. B, RCA, § 2(b).

53.     Accenture will also be (and likely already has been) irreparably harmed due to misleading communications from Trautman's counsel about the status of her employment.  On February 10, 2021, Trautman's counsel emailed Accenture, confirming that "as we discuss resolving this matter: (i) WIPRO will refrain from issuing a press release; and (ii) [Trautman] will not commence employment with WIPRO.  If these plans change, I will give you sufficient advance notice."  At some point during the next week, Trautman updated her LinkedIn profile to reflect her new position at Wipro.  On February 18, Trautman's counsel again assured Accenture that Trautman had not started working at Wipro, and, in fact, she was driving to Hilton Head Island, South Carolina, for a personal trip.

54.     Accenture remained under the impression that Trautman and her counsel would honor the agreement that she would "not commence employment" until this matter was resolved, but it had been misled.  It was not until March 2 that Accenture learned that, in fact, Trautman had already started working for Wipro on February 18, the very day that her counsel assured Accenture that was not the case.  Trautman deceived Accenture by starting in her role at Wipro and continuing to represent through her counsel that she had not, and by failing to provide Accenture with any notice (let alone the advance notice promised by her counsel) that this had occurred.

55.     Trautman and Wipro engaged in further troubling conduct that confirmed that she cannot be trusted to abide by reasonable restrictions in her role at Wipro.  After Accenture learned Trautman had already begun working at Wipro, Accenture employees began receiving emails from an executive recruiter working on behalf of Wipro and Trautman.  These emails targeted Accenture sales executives, who were told that a "leadership career opportunity" awaited them at Wipro.  The solicitation said that the recruiter had been "working extensively with Thierry Delaporte [Wipro's CEO] [and] Stephanie Trautman . . . to identify a new league of leaders for driving their next

growth phase."  Another e-mail from this recruiter told an Accenture employee that she should join Wipro because it is "currently witnessing a global transformation under their new CEO and Chief Growth Officer," *i.e.,* Stephanie Trautman.

56.     These recruiter emails also run counter to Trautman's separate obligation to not "directly or indirectly, solicit, employ or retain, ***or assist any other individual, person, firm or other entity*** in soliciting, employing or retaining, any employee or other agent of Accenture or any of its Affiliates" with whom she had certain contacts with.  *See* Ex. 1, Employment Agreement at Ex. B, RCA, § 1(d) (emphasis added).

57.     Thus, in the midst of a dispute over Trautman's non-compete with Accenture and despite Trautman's contractual obligations otherwise, Wipro sought to recruit Accenture employees to join Trautman in her effort to compete against Accenture, specifically invoking the "growth" role for which Wipro hired Trautman.  Accenture likely has already been irreparably harmed by Wipro and Trautman's actions, and will continue to be if a preliminary injunction is not granted.

**VII.    Accenture Satisfies All Other Elements For Issuance Of A Preliminary Injunction**

58.     Injunctive relief is warranted here.  Accenture is more than likely to prevail on the merits in arbitration, establishing that Trautman has breached the restrictive covenants in the Employment Agreement.   The limitations on Trautman's post-Accenture employment are reasonable, and Accenture has a legitimate interest in safeguarding the relationships and goodwill it has with its customers.  Trautman has no viable defense for such breach, given that she has already started performing the same or similar services for Wipro within the same territory.

59.     The balance of the equities tips decidedly in support of a preliminary injunction against Trautman and in Accenture's favor.  Trautman was paid a substantial amount of money by Accenture, and is only being asked to honor an agreement that she signed willingly and in

exchange for such substantial compensation.  If she works in the Chief Growth Officer position at Wipro, she will breach the explicit terms of her Employment Agreement.

60.     The preliminary injunction will further the public interest through the enforcement of contracts generally, by encouraging parties to abide by their agreements, and by allowing companies to protect their investments in their intellectual property and their employees, without the threat that the employees would then use that investment to the companies' detriment for a reasonable period of time.

61.     A preliminary injunction is warranted given the factors discussed above.

## COUNT I
## PRELIMINARY INJUNCTION
## BASED ON BREACH AND THREATENED BREACH OF
## RESTRICTIVE COVENANT AGREEMENT

62.     Accenture incorporates each and every allegation above as if set forth fully herein.

63.     The Restrictive Covenant Agreement, and the Non-Competition Covenant therein, is an enforceable agreement that imposes upon Trautman contractual obligations.

64.     Accenture has complied with all material terms of this agreement.

65.     Trautman has breached the terms of this agreement by, among other things, accepting a position as Chief Growth Officer for Wipro, and starting in that position on February 18, 2021, without waiting for the expiration of the twelve-month non-compete period to which she expressly agreed.

66.     As Trautman agreed in the RCA, Accenture will be significantly and irreparably harmed if Trautman competes with Accenture during the twelve months following her termination of employment.  *See* Ex. 1, Employment Agreement at Ex. B, RCA, Preamble.

67.     As Trautman's most recent and prior positions at Accenture are substantially similar to her new role at Wipro, she is presently breaching her Non-Competition Covenant and will continue to do so each and every day in which she serves in her current role at Wipro.

68.     Such harm is substantial and cannot be adequately remedied through monetary relief.

69.     Accenture has initiated arbitration against Trautman to prevent her ongoing breach of her Employment Agreement.

70.     Injunctive relief is needed pending arbitration of this dispute in order to preserve the value of Accenture's business assets and trade secrets that are at risk of disclosure in Trautman's new role at Wipro.

71.     The Employment Agreement allows Accenture to seek a preliminary injunction in aid of arbitration to restrain Trautman from committing or continuing to commit a violation of any part of the agreement, including the Non-Competition Covenant.

72.     Unless injunctive relief is granted, Accenture will continue to suffer immediate and irreparable harm until this dispute can be resolved through arbitration.

73.     In these circumstances, Accenture is entitled to a preliminary injunction in aid of arbitration to prevent such irreparable injury.

## <u>PRAYER FOR RELIEF</u>

74.     The arbitration provisions in the Employment Agreement are valid and enforceable.

75.     This Court is empowered to issue preliminary injunctive relief pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, which authorizes this Court to enter an Order directing that arbitration proceed in the manner provided for in the arbitration agreement, *see* 9 U.S.C. § 4, to preserve the meaningfulness of arbitration by preventing a party from irreversibly changing the status quo, and by the explicit terms of the Employment Agreement.

WHEREFORE, Plaintiff Accenture respectfully requests judgment seeking relief against Defendant Trautman as follows:

A.     A preliminary injunction ordering Trautman to refrain from: (i) breaching the terms of her Employment Agreement with Accenture, including the Non-Competition Covenant contained in the Restricted Covenant Agreement, and (ii) continuing her employment with Wipro as Chief Growth Officer until February 2022 or further order by an arbitrator convened in connection with an arbitration pursuant to the Employment Agreement, whichever is sooner; and

B.     Awarding Accenture such further relief as the Court deems just and proper.

Dated: March 19, 2021                        Kirkland & Ellis LLP

<u>*/s/ Craig S. Primis*</u>
Craig S. Primis
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
United States
Telephone: +1 202 389 5000
Facsimile: +1 202 389 5200
cprimis@kirkland.com

Michael B. Slade (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
United States
Telephone: +1 312 862 2000
Facsimile: +1 312 862 2200
mslade@kirkland.com

Alexia R. Brancato
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
United States
Telephone: +1 212 446 4800
Facsimile: +1 212 446 4900
alexia.brancato@kirkland.com

*Attorneys for Accenture LLP*